**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 24-14097

————————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

AUGUSTUS C. ROMAIN, JR.,
   a.k.a. Gazi Kodzo,
JESSE NEVEL,
   a.k.a. Jesse Nevelsky,
PENNY JOANNE HESS,
OMALI YESHITELA,
   a.k.a. Joseph Waller,

*Defendants-Appellants.*

————————————————

Appeals from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:22-cr-00259-WFJ-AEP-7

————————————————

Before WILLIAM PRYOR, Chief Judge, and JILL PRYOR and BRASHER, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether sufficient evidence supports convictions for conspiracy to act as foreign agents without notifying the attorney general, whether the convictions violate the First Amendment, and whether the district court erred in refusing to give a requested jury instruction or should have granted a new trial based on prosecutorial misconduct. For years, members of the African People's Socialist Party followed the direction of Alexander Ionov of the Russian Federation-backed "Anti-Globalization Movement." Ionov funded trips for Party leadership to Moscow, sponsored multiple Party events, told the Party to publish pro-Russian statements, and appeared on Party media. A grand jury indicted three Party members and one former member for acting as foreign agents without notifying the attorney general, *see* 18 U.S.C. § 951(a), and conspiracy to do the same, *id*. § 371. After trial, a jury found them guilty of conspiracy. We affirm.

## I.  BACKGROUND

Omali Yeshitela founded the African People's Socialist Party in 1972 and still chairs it today. Headquartered in St. Petersburg, Florida, the Party "supports the rights of African people throughout the world to be free from colonialism and exploitation." Penny Hess and Jesse Nevel are Party members, and Augustus Romain was a member until 2018. After he left the Party, Romain formed

the Black Hammer Party to prompt "the masses in America to revolution."

Aleksandr Ionov, a Russian citizen, directs the Anti-Globalization Movement of Russia, which purports to defend "the right of peoples to self-determination and [the] building of the multipolar world." Ionov is an asset of the Russian Federal Security Service. He regularly communicates with Service officers Yegor Popov and Aleksei Sukhodolov about Movement endeavors.

In May 2015, Ionov invited Party members on an "all expenses paid" trip to Russia to meet "other activists and establish close ties with Russian society." Yeshitela accepted the invitation. Before Yeshitela's trip, Hess told a Movement officer that Yeshitela would "like to meet with an official representative of the Russian government" and "[h]ave [his] own event to speak to students, anti-imperialists and workers about the struggle of African people."

After Yeshitela returned from Russia, Ionov and the Party formed, according to Hess, a "[d]eepening relationship." They were "in touch almost every day." In July, Ionov asked Hess whether the Party was interested in organizing events funded by the Movement. Later that month, Ionov donated $500 to the Party as part of a "Reparations Challenge." And that month, Ionov told Hess that he "need[ed] [her] to make [a] draft of [a] [United Nations] petition on [g]enocide of African people in [the] U.S. since the beginning of time." Ionov explained to Hess that the Movement could support the petition only "as cowriters/supporters" because "we're not exactly black to demand it for ourselves." Hess

agreed, and Ionov told her to prepare it "ASAP." Ionov later requested it be posted "to the websites of White House and change.org" and that it be published two days later. Hess said she would "make that happen."

The next month, Ionov invited Yeshitela to the Movement's "Dialogue of Nations," an "international expert conference" held in Moscow involving discussion of "the right of peoples to self-determination." Yeshitela again agreed to attend, and Ionov paid for his travel expenses.

While Yeshitela was in Moscow, Hess emailed him, Romain, and Nevel news coverage of the conference. One article in *The Guardian*, titled "Russia Funds Moscow Conference for US, EU and Ukraine Separatists," explained that "the National Charity Fund, which was founded as the National Military Fund in 1999 by . . . Vladimir Putin," funded the event. And after Yeshitela returned, he confirmed to Party members that the Movement had Russian government connections:

> Anti-Globalization Movement of Russia is a solid institution of Russian politic. Some articles said they got 30 percent funding from charity tied to Putin, et cetera, but it is clear that it is instrument of Russian government. This does not disturb us.

In January 2016, Ionov pledged $12,000 to the Party for a four-city encampment demonstration against genocide. Hess thanked Ionov for "envisioning such actions," and the Party held

the tour. At a Party debriefing, Yeshitela explained that the Movement asked for the tour as "a big mobilization around the genocide question."

But Ionov sent only $7,000 of the promised $12,000. Yeshitela traced the underpayment back to Ionov "hav[ing] to justify . . . getting resources for this." Indeed, Movement agents asked Hess to "give [them] links or send a report about the action," including, for example, "where the action took place" and "how many people attended."

At the Movement's request, Party leadership also published pro-Russian statements on Party media. In May 2016, Ionov asked Hess to publish two articles about Russians detained in America. And another Movement agent asked Hess to post a statement supporting the Russian Olympic team after some members were banned from the 2016 Olympics. Hess and Yeshitela complied both times. Later, a Movement member asked Yeshitela to record a "video with congratulations to the residents of the Donetsk People's Republic" on the anniversary of their "self-determination." Yeshitela prepared the video, and Ionov sent it to Popov.

On February 24, 2022, Russia invaded Ukraine. Ionov sensed that Russia was "losi[ng] the whole information campaign." So he made several "emergency phone [calls] with some leaders of anti-war organizations" in the United States, including Party members. Ionov "request[ed] [the Party] . . . support Russia in the information war unleashed by the West," and asked Yeshitela to "make an official statement on the situation and show support for Russia."

Yeshitela published YouTube videos discussing "Russia's defensive war in Ukraine against the global colonial powers." One video, for example, displayed the promo: "APSP stands with Russia. APSP stands with Putin." Ionov also appeared on Yeshitela's YouTube broadcast.

Ionov then targeted Meta, Facebook's parent company, because he believed Meta "allow[ed] calls for violence against Russians." In March 2022, he asked both Party members and Romain, who by then had founded the Black Hammer Party, to protest outside Meta buildings. Yeshitela and his team scheduled a protest entitled "Unfriend Facebook Lies" in Silicon Valley and another demonstration "demanding an end to the censorship of Russia and Africa" in front of Facebook's San Francisco office. Ionov also directed Romain to hold a protest at Meta and sent him banners to print, saying "Stop Meta Segregating Russian People. Stop Russian Segregation. Stop Meta Fascism" to display. Ionov booked flights and hotels for Romain and his associates. And he instructed Romain to send "a lot of videos and photos . . . that [he] c[ould] throw in the [Russian] media."

In April 2023, a federal grand jury returned a superseding indictment charging Yeshitela, Hess, and Nevel with acting as agents of Russia and its officials without notifying the attorney general. *See* 18 U.S.C. § 951(a). It also charged Ionov, Popov, Sukhodolov, Yeshitela, Hess, Nevel, and Romain with conspiracy to violate section 951(a). *See* 18 U.S.C. § 371 (criminalizing conspiracy "to commit any offense against the United States"). The indictment alleged

several overt acts in furtherance of the conspiracy, including the drafting of the United Nations petition, the encampment tour, the publication of the articles, Ionov's reports on the Party's and Romain's action to his Service handlers, and the protests at Meta. Ionov, Popov, and Sukhodolov remain at large.

The defendants moved to dismiss the indictment on the ground that section 951, as applied against them, prohibited "political speech and . . . advocat[ing] dissenting views" in violation of the First Amendment. A magistrate judge recommended the district court deny their motion. He reasoned that "[t]o the extent that [s]ection 951 incidentally burdens speech, it is content-neutral because it serves a purpose unrelated to the content of expression," and that section 951 satisfied intermediate scrutiny because it served the government's interest in "knowing the identity of those acting on behalf of a foreign government within the United States" without sweeping too broadly. The district court adopted the recommendation and denied the motion.

The defendants also moved to exclude communications between Ionov, Popov, and Sukhodolov on hearsay grounds. The district court denied the motion. It ruled that the communications were admissible as co-conspirator statements. *See* FED. R. EVID. 801(d)(2)(E).

At trial, the prosecution called Bureau Special Agent Iry Drupp, the case agent assigned to investigate the relationship between the Party and Ionov. Using communications extracted from the Party members' iCloud accounts, Drupp testified about the

Party's introduction to Ionov, Yeshitela's trips to Russia, the drafting of the UN petition, the planning of the encampment tour, and Ionov's payments to the Party. Bureau Special Agent Anna Myers, a "native Russian speaker" who reviewed data from Ionov's iCloud account, testified that Ionov received a "[c]ertificate of merit" from the Russian Federal Security Service for "rendering [the Service] assistance." And using their chat communications, she explained that Ionov reported to Popov and Sukhodolov about his work with Party members. Myers also outlined evidence that Popov supplied Ionov the money Ionov sent to the Party. Another special agent, Kelly Bowen, explained that when the Department of Justice posted notice of the indictment on its website, Ionov told Popov to "[t]rash the phones."

On direct examination, the prosecution asked Bowen about notes from a Party meeting held to discuss Movement proposals. One section of the minutes explained that the Party members contemplated creating a website:

> Website documenting what the cops do [to] Africans everywhere. Features should include ability of anyone throughout the U.S. to post this on our site. *Picture, names, addresses about the cops*. Need the design.

The Party members' defense team played several clips of the meeting on cross-examination.

On redirect, the prosecution asked Bowen to explain doxing. She said that "[d]oxing is when someone puts personal information about another individual online . . . like their address, name

and address, something like that." The prosecution then asked her whether "in that meeting" the Party members "discuss[ed] a plan to work on a doxing website with the Russians." She said yes. After the prosecution played the relevant portion, it asked Bowen, "So when Yeshitela is referring to support to build this doxing website, whose support is he referring to?" The defense objected that it did not "see any reference to doxing." The prosecution then reframed its question, "[W]hen . . . Yeshitela says that . . . they have support to build a website to publish the personal information of police officers, judges, and prosecutors, whose support is he referring to?" Bowen responded that Yeshitela was "referring to [Movement] support."

The defendants moved for a judgment of acquittal, which the district court denied. The defendants then moved to admit several exhibits suggesting that the Party was anti-war and pro-Russia even before its contact with the Movement.

At the charge conference, the defense proposed "remind[ing] the jury that they have to find the elements of the [section] 951 violation to find the conspiracy." The Party members also asked for a "limiting instruction" that evidence of Romain's actions after Romain's separation from the Party should not be considered against them. The district court denied both requested instructions.

The jury found the defendants guilty of conspiracy to violate section 951 but not guilty of violating section 951. The district

court sentenced Romain to 60 months' probation and each of the Party members to 36 months' probation.

## II. STANDARDS OF REVIEW

We review *de novo* "whether the application of [a] statute . . . was constitutional." *United States v. Corrigan*, 144 F.3d 763, 768 n.4 (11th Cir. 1998). We also review *de novo* the sufficiency of the evidence. *United States v. Jimenez*, 972 F.3d 1183, 1190 (11th Cir. 2020). Although the parties dispute whether the Party members preserved the issue of prosecutorial misconduct, we elect to review that issue *de novo* because the standard of review is not dispositive. *See United States v. Al Jaberi*, 97 F.4th 1310, 1322 (11th Cir. 2024). We review the "legal correctness of a jury instruction" *de novo*, *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000), but the "refusal to give a requested jury instruction" for abuse of discretion, *United States v. Gumbs*, 964 F.3d 1340, 1347 (11th Cir. 2020). And we review evidentiary rulings for abuse of discretion. *United States v. Keegan*, 161 F.4th 1334, 1338 (11th Cir. 2025).

## III. DISCUSSION

We divide our discussion into four parts. First, we explain that sections 951 and 371 are constitutional as applied to the defendants. Next, we explain that the government offered sufficient evidence to support the conspiracy convictions. Third, we explain that the district court did not err by denying the requested jury instructions. Finally, we explain that the prosecution did not commit misconduct.

*A. The Convictions Do Not Violate the First Amendment.*

The defendants argue that the indictment "directly target[ed] lawful political speech" in violation of the First Amendment. We disagree. Neither section 951 nor section 371, as applied, violates the defendants' right to free speech.

To address why the defendants could be convicted of the conspiracy offense, we explain why section 951—the violation of which was the object of the conspiracy—passes constitutional muster. We apply "First Amendment scrutiny in cases involving governmental regulation of conduct that has an expressive element." *TikTok Inc. v. Garland*, 145 S. Ct. 57, 65 (2025) (citation modified). That rule from *United States v. O'Brien* requires a "sufficiently important governmental interest" to regulate a "course of conduct" involving both "speech and nonspeech elements." 391 U.S. 367, 376–77 (1968) (citation modified). Conduct is "expressive" and implicates "speech" when accompanied by "an intent to convey a particularized message" likely to "be understood by those" who view it. *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (citation modified).

The indictment necessarily implicated speech. The indictment alleged that the defendants acted and conspired to act at Ionov's direction through several expressive and speech acts, including "author[ing] and publish[ing] articles," "drafting reports," organizing the encampment tour, "hosting virtual conferences" on political and social issues, and "mak[ing] public statements in support of the Russian Federation." So we must next determine

whether the charged offenses are content neutral so that we can decide what level of judicial scrutiny applies. *See Scott v. City of Daytona Beach*, No. 24-12662, slip op. at 26 (11th Cir. June 25, 2026).

Where section 951 and section 371 burden expressive conduct and speech, they do so on a content-neutral basis. A regulation of speech or expressive conduct is content neutral "if the justification for the regulation is unrelated to the suppression of free expression," *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1292 (11th Cir. 2021) (*Food Not Bombs II*), and it does not "target[] speech based on its communicative content," *Scott*, slip op. at 29 (citation modified); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."). Section 951 is content neutral because it applies equally to all acts taken under the direction or control of a foreign government without regard to the "content of the message" an agent spreads. *Food Not Bombs II*, 11 F.4th at 1292; *cf. TikTok*, 145 S. Ct. at 67 (holding prohibition on TikTok content neutral because Congress enacted it "due to a foreign adversary's control over the platform," without "target[ing] particular speech" or "regulat[ing] speech based on its function or purpose"). Section 951 regulates conduct and speech regardless of *which* government directs it or *what* a foreign government directs.

Because section 951 is content neutral, we "subject [it] to an intermediate level of scrutiny." *TikTok*, 145 S. Ct. at 67 (citation

modified). Under intermediate scrutiny, "we will sustain a content-neutral law if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Id*. (citation modified).

Section 951 satisfies intermediate scrutiny. "[T]he Government has an interest in knowing the identity of those acting on behalf of a foreign government within the United States, whether the action is legal or not." *United States v. Duran*, 596 F.3d 1283, 1295 (11th Cir. 2010). "That rationale is decidedly content agnostic" because it "neither references the content of speech [of agents] nor reflects disagreement with the message . . . [they] convey[]." *Tik-Tok*, 145 S. Ct. at 68. And by requiring agents only to *notify* the attorney general before acting, section 951 advances that interest as narrowly as possible. *See* 18 U.S.C. § 951; 28 C.F.R. § 73.3 (laying out notification requirements). Indeed, after notifying the attorney general about his status, an agent may engage in *any* speech or expressive conduct on *any* topic.

The defendants argue that we should apply strict scrutiny because *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), treats content-neutral laws as "content-based when *used* by the government to target speech." But *Reed* reaffirms only that "facially content neutral" regulations "will be considered content-based" when they "cannot be justified without reference to the content of the regu-

lated speech" or "were adopted by the government because of disagreement with the message the speech conveys." *Id.* at 164 (citation modified). Under that rule, section 951 is content neutral.

Neither *De Jonge v. Oregon*, 299 U.S. 353 (1937), nor *Cohen v. California*, 403 U.S. 15 (1971), requires us to apply strict scrutiny. In *De Jonge*, the Supreme Court vacated a conviction under Oregon law for conducting an assembly of "any group which t[aught] or advocate[d] the doctrine of criminal syndicalism." 299 U.S. at 356 n.1. The defendant presided at a Communist Party meeting "at which nothing unlawful was done or advocated." *Id.* at 357, 360–62. The Court held that the law swept too broadly because "peaceable assembly for lawful discussion cannot be made a crime." *Id.* at 365. And *Cohen* sustained an as-applied challenge to a law prohibiting "maliciously and willfully disturbing the peace or quiet of any neighborhood or person by offensive conduct" where the defendant was convicted for "wearing a jacket bearing the words 'Fuck the Draft.'" 403 U.S. at 16, 26 (citation modified). The Court applied heightened scrutiny because the conviction "rest[ed] solely upon speech," not "upon any separately identifiable conduct . . . which, on its face, does not necessarily convey any message" or "arguably could be regulated without effectively repressing [his] ability to express himself." *Id.* at 18 (citation modified) (declining to apply the rule from *O'Brien*).

Contrary to the defendants' arguments, *De Jonge* did not establish a rule that a law violates the First Amendment whenever it burdens "otherwise lawful" meetings or speech. If that were the

case, every content-neutral regulation or time, place, and manner restriction would be unlawful. *But see, e.g.*, *Rock Against Racism*, 491 U.S. at 803. Instead, *De Jonge* ruled that "the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Matal v. Tam*, 582 U.S. 218, 244 (2017) (plurality opinion) (citation modified); *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 39 (2010) (explaining that under *De Jonge*, states may not "criminalize[] the *mere fact* of [persons] associating with" groups (emphasis added)). And section 951 does not burden speech "merely because" the government objects to its content. *Matal*, 582 U.S. at 244 (citation modified).

Moreover, unlike the law in *Cohen*, section 951 also targets non-expressive conduct. Although an act of omission, failure to notify the attorney general is an essential element of section 951. That element is "separately identifiable" from the defendants' speech and does not inherently convey any message. *Cohen*, 403 U.S. at 18. The notification requirement neither formally nor functionally repressed the Party's ability to express its political views. *See id.*; *cf. Meese v. Keene*, 481 U.S. 465, 480 (1987) (holding that registration requirement of foreign "political propaganda" placed "no burden on protected expression" because it did "not prohibit, edit, or restrain [its] distribution"). Section 951 and the conspiracy statute are constitutional as applied.

### B. Sufficient Evidence Supports the Conspiracy Convictions.

The Party members and Romain argue that insufficient evidence supports their convictions. "The evidence is sufficient if a

reasonable jury could find that the evidence established the defendant's guilt beyond a reasonable doubt." *Jimenez*, 972 F.3d at 1190. We "view the record in the light most favorable to the government." *Id.*

We divide our discussion into three parts. First, we explain that sufficient evidence supports the convictions. Second, we explain that the prosecution was not required to prove that the defendants knew about the notification requirement. Finally, we conclude that the prosecution did not rely on inadmissible hearsay.

1. The Government Proved an Unlawful Conspiracy.

To prove a conspiracy, the government must present evidence of "an agreement among two or more persons to achieve an unlawful objective," "knowing and voluntary participation in the agreement," and "an overt act by a conspirator in furtherance of the agreement." *Id.* at 1190–91 (citation modified). At trial, the government sought to prove that the defendants' "unlawful objective" was the violation of section 951. "To violate [section] 951, . . . a person must act," "the action must be taken at the direction of or under the control of a foreign government" or foreign official, and "the person must fail to notify the Attorney General before taking such action." *Duran*, 596 F.3d at 1291; *see* 18 U.S.C. § 951(d) (defining "agent of a foreign government" to mean "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official").

Sufficient evidence supports the convictions. The defendants concede that they entered a voluntary "agreement" with each

other and the Russians. Indeed, Yeshitela explained during Party meetings that the "Party developed a relationship with forces in Russia" and entered the relationship as "allies." Moreover, the defendants' agreement aimed to violate section 951.

The conspirators committed several overt acts to advance their objective. Yeshitela knew that the Movement was an "instrument of Russian government"—a fact he shared with the others. And Party members consistently obliged Ionov's "needs" and "requests," which allowed a reasonable jury to find that they agreed to be subject to his direction. Toward the beginning of their "[d]eepening relationship," Ionov told Hess he "need[ed] [her]" to draft the United Nations petition, and he later told her to prepare it "ASAP." Ionov "asked [the Party] for a big mobilization . . . around the genocide question" and "envision[ed]" the encampment tour as part of the mobilization. The Party members knew that the Russian government sponsored the encampment because Ionov told Yeshitela he "need[ed] . . . details" from the tour to "justify . . . getting resources" for it. The Party members also agreed to Ionov's requests to post statements supporting the Russian Olympic team, to record a video of congratulations for the "Donetsk People's Republic", to use social media to support Russia during the Ukraine invasion, and to stage two protests outside of Meta. And *none* of the defendants notified the attorney general of those activities.

The defendants contend that the government offered, at most, proof that they were "willing to do" what Ionov asked them,

which falls short of an agency relationship. And they point to evidence that their preexisting views aligned with Ionov's, making them only allies, not agents. But we cannot credit the defendants' view of the evidence, even if it is permissible. *See Jimenez*, 972 F.3d at 1190.

The jury could have reasonably found that the defendants subjected themselves to Ionov's guidance by carrying out his plans. *See Direction*, WEBSTER'S SECOND NEW INT'L DICTIONARY 738 (1959) ("guidance"); *Direction*, WEBSTER'S THIRD NEW INT'L DICTIONARY 640 (1993) ("guidance or supervision of action"). The defendants might have a sounder argument if section 951(d) targeted only acts taken subject to a foreign principal's "control." *See United States v. Rafiekian*, 991 F.3d 529, 540–41 (4th Cir. 2021) (suggesting that "control" under section 951 "mirror[s] an employer's control over the workings of an employee"). But to give "direction" and "control" independent effect, we interpret the former term to connote a lesser degree of constraint than the latter. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 26, 174 (2012) (explaining that under the surplusage canon, "[i]f possible, every word and every provision is to be given effect"); *see also United States v. Ullah*, 173 F.4th 399, 441–43 (2d Cir. 2026) (Menashi, J., dissenting) (giving "direction" the ordinary meaning of "guidance or supervision" to allow it independent effect from "control").

It is no surprise that the Party members were happy to let Ionov direct them. As the government explains, "members of a

conspiracy almost always seek to benefit in ways separate from the conspiracy's goals." Indeed, the Party's shared ideology with Ionov established its members' motive to join the conspiracy and act under his direction.

### 2. Section 951 Does Not Require Proof of Knowledge of Its Notification Requirement.

The defendants argue that we must vacate their convictions because the government offered no evidence that they "had knowledge of [section] 951's registration requirement." Precedent forecloses that argument. In *United States v. Campa*, we held that "section 951 does not require proof that the defendant knew of the requirement to register." 529 F.3d 980, 999 (11th Cir. 2008). We explained that if "no specific intent element is apparent on the face of the statute, the crime is one of general intent," and "[a] defendant need not intend to violate the law to commit a general intent crime." *Id*. (citation modified). And in *Duran*, we held that a *conspiracy* to violate section 951 does not require proof that any defendant was on "notice of the registration requirement." 596 F.3d at 1296. Section 371 "does not impose its [willfulness] scienter requirement upon the general intent offense that is the object of the conspiracy." *Id*. (citing *United States v. Feola*, 420 U.S. 671, 686–87 (1975)).

The defendants argue that the intervening decisions in *Rehaif v. United States*, 139 S. Ct. 2191 (2019), and *Ruan v. United States*, 142 S. Ct. 2370 (2022), abrogated our holdings in *Campa* and *Duran*. In *Rehaif*, the Supreme Court interpreted section 922(g), which includes a generally applicable "scienter provision." 139 S. Ct. at

2195. The Court concluded that this provision "appl[ied] to all the subsequently listed elements of the crime." *Id.* at 2196 (citation modified). Similarly, in *Ruan*, the Court held that the "'knowingly or intentionally' *mens rea*" requirement in a drug distribution statute "applie[d] to the [statute's] 'except as authorized' clause." 142 S. Ct. at 2377, 2382.

Neither decision abrogates our precedent. *See United States v. Dubois*, 139 F.4th 887, 893 (11th Cir. 2025) (holding abrogation requires the "demol[ition] and eviscerat[ion]" of a precedent's "fundamental props" (citation modified)). *Campa* ruled that section 951 is a general intent crime because it *lacks* a "heightened mens rea" requirement, and it did not except proof of general intent from any element. 529 F.3d at 999. And neither decision addresses section 371, much less overrules *Feola*, which we applied in *Duran*. *See Feola*, 420 U.S. at 687 ("[Section 371] offers no textual support for the proposition that to be guilty of conspiracy a defendant in effect must have known that his conduct violated federal law.").

### 3. The District Court Did Not Abuse Its Discretion by Admitting Text Conversations Between Ionov and Others Working for the Service.

The defendants' argument that the district court erred by admitting chat conversations between Ionov and Service officers, which they say was the "only evidence of a connection to the Russian government," fails. It ignores the evidence that the Party members knew, after Yeshitela's Moscow trip, that the Movement

was an "instrument of Russian government." And the district court did not abuse its discretion by admitting the chat conversations.

Statements that would otherwise be hearsay are admissible against a party when "made by the party's coconspirator during and in furtherance of the conspiracy." FED. R. EVID. 801(d)(2)(E). Under this rule, the government must establish by a preponderance of the evidence that a conspiracy existed, the conspiracy included the declarant and the defendant against whom the statement is offered, and the declarant made the statement during and in furtherance of the conspiracy. *United States v. Carthen*, 906 F.3d 1315, 1320 (11th Cir. 2018).

The defendants contend that the government "produced no independent evidence that the alleged Russian co-conspirators were members of a conspiracy." But Rule 801(d)(2)(E) "does not require 'substantial independent evidence' of a conspiracy." *United States v. Graham*, 123 F.4th 1197, 1249 (11th Cir. 2024). The conspirators' statements are enough to prove it.

The defendants next argue that the communications did not further the conspiracy with the Party members. We "appl[y] a liberal standard in determining whether a statement was in furtherance of a conspiracy": it must "only further the interests of the conspiracy in some way." *United States v. Siegelman*, 640 F.3d 1159, 1181 (11th Cir. 2011) (citation modified). "[S]tatements between conspirators which provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current sta-

tus of the conspiracy further the ends of the conspiracy." *Id*. (citation modified). In several messages, Ionov informed the Service members of the status of their conspiracy with Party members. For example, Ionov told Popov about a video in which he appeared with Party members and forwarded him videos Yeshitela produced for the Movement. The district court acted within its discretion by ruling that the text messages advanced the conspiracy.

The defendants say that Ionov "intended to frustrate the[ir] . . . goals as indicated in a message to Popov that [the Russians] were 'ruining [the Party].'" In *United States v. Arbane*, we explained that a "government agent or informant who aims to frustrate the conspiracy" cannot be a member of that conspiracy. 446 F.3d 1223, 1228 (11th Cir. 2006). But we have never applied that rule to anyone other than an American agent surreptitiously working with conspirators. Even if Ionov was a "government agent" who sought to "ruin" *the Party*, that fact has no bearing on whether he aimed to frustrate *the conspiracy* to violate section 951. Indeed, he was the principal foreign agent directing the Party to achieve Russia's ends. *See* 18 U.S.C. § 951(a), (d).

### C. The District Court Did Not Abuse Its Discretion by Refusing to Give the Proposed Jury Instructions.

The defendants argue that the district court abused its discretion by denying two of their requested jury instructions. "[W]hen determining whether the district court's refusal to give a requested jury instruction warrants reversal," we ask whether "the requested instruction is a substantially correct statement of the

law," "the jury charge given addressed the requested instruction," and "the failure to give the requested instruction seriously impaired the defendant's ability to present an effective defense." *United States v. Hill*, 799 F.3d 1318, 1320 (11th Cir. 2015) (citation modified).

The defendants first argue that the district court should have instructed the jury that it must "find the elements of the [section] 951 violation to find the conspiracy." But that instruction would have misstated the law. Conspiracy "may exist and be punished whether or not the substantive crime ensues." *Salinas v. United States*, 522 U.S. 52, 65 (1997). It sufficed that the district court "set forth" "[t]he elements of th[e] crime alleged to be the object of the conspiracy" in its instructions.

The Party members contend that the district court should have given a "limiting instruction[] to prevent the jury from considering the evidence offered against Romain" from after his "expulsion" from the Party. But that instruction would have been erroneous because whether Romain's expulsion effected a withdrawal from the conspiracy with the Russians was a question for the jury to decide. *Cf. Mut. Life Ins. Co. v. Snyder*, 93 U.S. 393, 395 (1876) ("[T]he judge . . . is not authorized to take from the jury the right of weighing the evidence bearing on controverted facts."). The district court correctly explained how a defendant may withdraw from a conspiracy and the effect of a withdrawal. The refusal to give a limiting instruction also did not seriously impair the Party members' defense because they could argue Romain had his own

conspiracy with Ionov. During Bowen's cross-examination, for example, they elicited testimony that Romain had "been expelled," and there was "no more association between the [P]arty and Romain after that."

*D. The Prosecutor's Questions About Doxing Involved No Misconduct.*

The defendants argue that they should be granted a new trial because the prosecution "falsely accus[ed] the[m] . . . of planning to build 'a doxing website' with the Russians.'" "Prosecutorial misconduct justifies a new trial only if the remarks in question were both . . . improper and . . . prejudicial to the defendant's substantial rights." *Al Jaberi*, 97 F.4th at 1328 (citation modified). A "prosecutor's remarks, suggestions, insinuations, and assertions are improper when they are calculated to mislead or inflame the jury's passions." *Id*. (citation modified).

The prosecutor's questions to Bowen were not calculated to mislead or inflame the jury. While exploring the Party's interactions with Ionov, he asked Bowen whether the Party members had "discuss[ed] a plan to work on a doxing website with the Russians," and whether they "ha[d] support to build a website to publish the personal information" of various officials. Those questions accurately reflected Yeshitela's meeting notes about the Movement's proposed website. And the questions were consistent with the prosecution's concession at sentencing that the website was never "built" or "completed," and that the Party members took "no further action . . . related to th[e] website."

The defendants object that the jurors requested that their personal information be sealed "following testimony regarding 'doxing.'" And they suggest the word "doxing" carries a special ability to "induce fear and contempt." But the jury's concern stemmed from the evidence, not the prosecution's questions. By all accounts, Bowen accurately described the proposal as involving "doxing." *See, e.g.*, *Dox*, OXFORD ENGLISH DICTIONARY (2025) ("to search for and publish private or identifying information about (an individual) on the internet, typically with malicious intent"); *Dox*, THE AMERICAN HERITAGE DICTIONARY (2022) (similar).

## IV. CONCLUSION

We **AFFIRM** the defendants' convictions.